# FOR PUBLICATION



FILED
Oct 31 2014, 10:01 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**EDWARD R. HANNON**
**GREGORY C. IRBY**
Steuerwald Hannon Zielinski & Witham
Danville, Indiana

ATTORNEYS FOR APPELLEES:

**MICHAEL B. LANGFORD**
**BRADEN K. CORE**
Scopelitis, Garvin, Light, Hanson &
Feary, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL KENT SMITH, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 32A01-1402-PL-78 |
| | ) | |
| THOMAS L. TAULMAN, II, THOMAS MCCLELLAN, | ) | |
| CHRISTINA R. HURLEY, GARY R. MEUNIER, | ) | |
| DENNY D. SMITH, T.K.O. ENTERPRISES, INC.; | ) | |
| T.K.O. COMMERCIAL DEVELOPMENT, LLC; | ) | |
| SCS FLEET SERVICES, LLC; GTS PROPERTIES, | ) | |
| LLC, and T.K.O. SOUTH, LLC, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Stephenie D. LeMay-Luken, Judge
Cause No. 32D05-1207-PL-82

**October 31, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

The Indiana Supreme Court recently reaffirmed that Indiana's summary judgment standards establish a "high bar" for summary judgment movants to clear. Hughley v. State, 15 N.E.3d 1000, 1004 (Ind. 2014). "In particular, while federal practice permits the moving party to merely show that the party carrying the burden of proof [at trial] lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively 'negate an opponent's claim.'" Id. at 1003 (quoting Jarboe v. Landmark Cmty. Newspapers of Ind., Inc., 644 N.E.2d 118, 123 (Ind. 1994)). In this summary judgment appeal, we consider the plaintiff-nonmovant's personal claims as well as his direct and derivative shareholder claims against the defendants-movants. After determining whether the trial court erred when it entered summary judgment despite pending discovery, we assess whether the summary judgment movants designated evidence to either affirmatively negate an element of the nonmovant's remaining claims or to establish all of the elements of an affirmative defense. Where they have done so, we consider whether the nonmovant designated evidence to establish a genuine issue of material fact to preclude the entry of summary judgment.

Specifically, Michael Kent Smith ("Kent") appeals the trial court's entry of summary judgment for Thomas L. Taulman, II ("Taulman"); Thomas McClellan, Christina R. Hurley, Gary R. Meunier, and Denny D. Smith (who are individually referred to in this opinion by their last names and collectively referred to as "the Employees"); and T.K.O. Enterprises, Inc., d/b/a T.K.O. Graphix ("T.K.O. Enterprises"); T.K.O. Commercial Development, LLC ("T.K.O. Commercial"); SCS Fleet Services,

2

LLC ("SCS"); GTS Properties, LLC ("GTS"); and T.K.O. South, LLC ("T.K.O. South") (collectively, "the T.K.O. Companies") (Taulman, the Employees, and the T.K.O. Companies are collectively referred to, where appropriate, as either "the Defendants" or "the Appellees"). Kent raises the following two issues for our review:

1. Whether the trial court abused its discretion when it denied his motion to compel the production of certain evidence; and

2. Whether the trial court erred when it entered summary judgment for the Appellees.

We hold that the trial court abused its discretion when it denied Kent's motion to compel, and, therefore, the court erred when it entered summary judgment for the Appellees on certain claims even though the pending discovery was relevant to those claims and Kent had been diligent in seeking that discovery. As to Kent's other claims, we hold that the Appellees designated evidence to establish an affirmative defense regarding Kent's defamation claim against Taulman, and Kent failed to designate evidence in response to negate an element of this affirmative defense. We also hold that the Appellees designated evidence to negate an element of Kent's claim that Taulman breached a fiduciary duty when he fired Kent and on Kent's claims that the Employees breached their fiduciary duties, and Kent failed to designate evidence in response to demonstrate that summary judgment should be precluded on these claims. Finally, we hold that the Appellees failed to designate evidence to negate at least one element of Kent's shareholder derivative claims, in which Kent alleged that some of the T.K.O. Companies had agreed to lease real property below fair rental value and that other T.K.O.

Companies had engaged in ghost employment. Thus, we affirm in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

In 1985, Thomas L. Taulman, Sr., Taulman, and Kent formed T.K.O. Enterprises. T.K.O. Enterprises is a full-service graphics firm, and its work includes the design, manufacture, installation, and removal of graphics on trailers used in the trucking industry. Each of the three men owned T.K.O. Enterprises in equal one-third shares. Eventually, Taulman, Sr. sold some of his shares back to the company and transferred the remainder of his shares to his son, Taulman. From 2000 to late 2009, Taulman owned about 52% of the shares of T.K.O. Enterprises, and Kent owned the remaining shares, or about 48%.

Although Taulman, the President of T.K.O. Enterprises, was actively engaged in the management and promotion of the business, it is not clear that Kent had any specific job description. Rather, Kent was the Vice President, and he would help with various odds-and-ends around the company. Nonetheless, Taulman and Kent shared in the profits, and their respective incomes were based upon their ownership interests.

Over time, T.K.O. Enterprises expanded through the creation of the T.K.O. Companies, in particular:

- T.K.O. Commercial, which owns and manages certain real property and is owned equally by Taulman and Kent;

- SCS, which removes decals from and cleans semi-trailers and is equally owned by Taulman, Kent, Meunier, and Smith;

- GTS, which owns and manages certain real property and is 50% owned by T.K.O. Enterprises, 25% owned by Meunier, and 25% owned by Smith; and

- T.K.O. South, which owns and manages certain real property and is wholly owned by T.K.O. Enterprises.

Between 2005 and 2009, Taulman and Kent discussed having Kent sell his shares in T.K.O. Enterprises, but no agreement was reached. In 2009, T.K.O. Enterprises suffered substantial losses in business and faced bankruptcy. In June of that year, Huntington Bank ("Huntington") downgraded its relationship with T.K.O. Enterprises to "substandard" due to poor financial performance, which placed T.K.O. Enterprises' line of credit with Huntington in jeopardy. Appellant's App. at 114. On September 11, Tina Magyar, T.K.O. Enterprises' Controller, e-mailed Taulman and Kent to tell them that T.K.O. Enterprises was almost completely unable to meet its financial obligations. Id. at 631.

Shortly thereafter, Taulman invested $50,000 of his own money in T.K.O. Enterprises to cover operating expenses. Taulman asked Kent to make a similar investment. Kent declined. Instead, Kent agreed to reduce his annual salary from $120,000 to $50,000, and he agreed to condition his employment on working "a billable position." Id. at 598, 633. In working a billable position, Taulman informed Kent that Kent's job requirements would include reporting to McClellan or another assigned supervisor each week for specific instructions to help where needed, and that Kent would "have to be accountable for [his] work." Id. at 598.

On October 5, 2009, T.K.O. Enterprises' line of credit with Huntington expired, and the bank refused to automatically renew it. Also in October, Taulman sought to have a new investor, Terry Dillon, buy out Kent's shares in T.K.O. Enterprises. Taulman discussed this plan with Kent, and Kent agreed. But Huntington informed Taulman that it would not renew the line of credit even if Dillon bought out Kent, and the deal fell through.

Although facing tough market conditions, T.K.O. Enterprises, through Taulman and the rest of its sales staff, continued to pursue potential customers throughout 2009. In particular, in mid-2009 T.K.O. Enterprises began to engage TruGreen, a nationwide provider of residential and commercial lawn and landscape services, in what "had the potential to be a large account representing a sizeable volume of sales in 2010." Id. at 115. Kent was aware of T.K.O. Enterprises' attempt to secure a contract with TruGreen. In November of 2009, TruGreen selected T.K.O. Enterprises to demonstrate its products in a pilot program. Taulman informed Kent of this development.

Throughout this time T.K.O. Enterprises faced the prospect of bankruptcy. Taulman requested Kent to make a capital contribution on several occasions, which Kent declined to do. Kent was included on monthly e-mails that provided detailed reports on T.K.O. Enterprises' weak financial condition. Kent, a guarantor to T.K.O. Enterprises' line of credit, discussed having T.K.O. Enterprises "shut the doors to be able to pay vendors, pay our taxes, and walk away without filing personal bankruptcy." Id. at 234. Kent's understanding of the TruGreen negotiations, among others, was that there was "nothing to count on for me to invest money in the company" because the company "was

6

not going to make it." Id. Indeed, in late 2009, Kent told Taulman, Hurley, and Smith that, even if the company landed the TruGreen account, T.K.O. Enterprises should "do the TruGreen job if it comes in and then shut . . . down." Id. at 255.

On December 16, 2009, Taulman issued a notice of a special meeting of the board of directors to be held on December 21, which was also the date of T.K.O. Enterprises' annual shareholders meeting. According to the notice, new and additional shares in T.K.O. Enterprises would be offered, and Taulman was to receive 52% of those shares in exchange for his earlier $50,000 investment. Kent was to be given the option to purchase the remaining 48% of the new shares at the meeting.

Taulman attended the meeting on December 21 as President of T.K.O. Enterprises. Kent attended as Vice President. Hurley attended as Secretary. Also present were McClellan, Meunier, and Smith, high-ranking employees of T.K.O. Enterprises whom Taulman had invited. Kent had been informed before the meeting that Hurley, McClellan, Meunier, and Smith were each willing to invest up to $25,000 in T.K.O. Enterprises.

At that meeting, Kent asked "everyone's opinion of why they would invest into the company" and stated that he was "concerned with the future of the company." Id. at 400. Hurley's handwritten minutes of the meeting do not reflect any statements about TruGreen. However, the official minutes, which were prepared subsequent to the meeting by Taulman and reviewed and signed by Hurley as consistent with her recollection, reflect that Taulman stated at the meeting that "TruGreen was about 90% sure, but no signed purchase order at the [t]ime." Id. at 358, 404. And Hurley recorded

7

that at least three other accounts were discussed, along with Smith stating that he thought the "[i]ndustry was coming back" and McClellan stating there had been a small upswing in sales. Id. at 352. Meunier then added that he "feels very strong[ly] about the company and his future"; McClellan stated that he "believes in himself and work ethic" and that he "[w]ould take the gamble to keep his job"; and Hurley stated that she "wanted to keep what [she] had at T.K.O." because she "believed in the company." Id. at 352, 359.

Kent did not think the others had presented any information that "would benefit the company. There was nothing really to bank on." Id. at 237. As such, he agreed to waive his right to purchase the new shares and agreed to reduce his total shareholdings to 9.8% in T.K.O. Enterprises. Hurley, McClellan, Meunier, and Smith each then purchased 9.8% of T.K.O. Enterprises. Taulman remained the majority shareholder with 51% of the total shares. The parties' agreement became effective on December 22, 2009.

In March of 2010, TruGreen awarded its contract for graphics services to T.K.O. Enterprises. Largely as a result of this contract, T.K.O. Enterprises' sales in 2010 were the highest in its history. In July of 2010, Taulman fired Kent for leaving work before the end of work days, failing to keep regular hours, failing to report to McClellan and other supervisors, and failing to work billable positions.

On December 19, 2011, Kent filed his complaint against the Defendants. In his complaint, Kent alleged that Taulman and the Employees had breached fiduciary duties owed to Kent and that they had committed fraud at the December 21, 2009, meeting. Kent also alleged defamation against Taulman and a shareholder derivative action against the T.K.O. Companies, in which Kent alleged that some of the T.K.O. Companies had

8

agreed to lease real property below fair rental value and that other T.K.O. Companies had engaged in ghost employment.

During discovery, Kent requested the Defendants to produce "all communications they shared with one another as well as communications they shared with the company's bankers and customers." Appellant's Br. at 8. After the Defendants filed a request for a protective order based on, among other things, Kent's overbroad requests, the parties agreed to a relevant timeframe for the documents requested, and the Defendants withdrew their request for a protective order. The Defendants then responded to Kent by producing more than 10,000 pages of documents.

One document produced was a December 28, 2009, letter from Taulman to Huntington in which Taulman described the following outlook for 2010:

I feel 100% sure we will get the large order [with TruGreen] soon . . . .

\* \* \*

. . . As for projecting out the next 6 months, January and February are usually slow months but we are seeing good activity with the 2 semi trailer factories (Great Dane) that we do business with. Our fleet customers are saying that their maintenance costs are killing them and it would be cheaper to have new equipment than what it is costing them to keep their existing equipment. They are starting to request bids from us and some have decided to buy now. . . . Simon Mall is one of our accounts and we are currently bidding some large projects for them. . . . With all the new accounts we have landed this year and with one of our biggest competitors . . . being bought and closed down this year too[] we have gained a lot more of the market share . . . . As for what I can predict in the next 6 months, I think that January and February are break even months, March, April, May and June I believe will be profitable . . . and with TruGreen beginning in early 2010, I think that April and May could be even bigger. . . . If for any reason TruGreen is delayed or doesn't happen . . . we will still make money with our current accounts that we have for the next 6 months . . . .

9

Id. at 1080-81. Among other things, the Great Dane account was not an account raised by either Taulman or the Employees in response to Kent's questions at the December 21, 2009, meeting.

Following the production of documents, the parties held several depositions. In particular, the parties held Smith's deposition on August 8, 2013, and Meunier's deposition the next day. During those depositions, Kent learned that numerous documents within the scope of the first request for the production of documents had not been produced. As a result, on August 28, Kent submitted to the Defendants a second request for the production of documents. The Defendants responded on October 10 and stated, in relevant part, that they would "produce documents responsive" to Kent's requests. Id. at 779-95.

Nonetheless, just five days later on October 15, 2013, the Defendants filed their motion for summary judgment. After the parties agreed to allow Kent an extension of time in which to respond to the summary judgment motion, on November 26 Kent filed a motion to compel discovery. On December 23, 2013, Kent filed his response to the motion for summary judgment. Meanwhile, on January 3, 2014, the court granted the renewed request for a protective order on Kent's motion to compel, which allowed Kent to access, pursuant to his motion to compel, the Appellees' computers under a specific procedure.

On January 21, the court held a consolidated hearing on the Defendants' motion for summary judgment and on Kent's motion to compel. Following that hearing, the

court entered summary judgment for the Defendants on all of Kent's claims. A few days later, the court denied Kent's motion to compel. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One:  Motion to Compel

On appeal, Kent first asserts that the trial court abused its discretion when it denied his motion to compel. As we have explained:

> The trial court is vested with broad discretion in ruling on pre-trial inquiry under Indiana Trial Rules 26 through 37 and we will reverse only upon a showing of an abuse of discretion. Due to the fact-sensitive nature of discovery matters, the ruling of the trial court is cloaked in a strong presumption of correctness on appeal. Discovery, like all matters of procedure, has ultimate and necessary boundaries. It is within the discretion of the trial court to place bounds on the duration of discovery.
>
> [I]t is generally improper to grant summary judgment when requests for discovery are pending. However, when pending discovery is unlikely to develop a genuine issue of material fact, summary judgment may be granted.

Mut. Sec. Life Ins. Co. v. Fidelity & Deposit Co., 659 N.E.2d 1096, 1103 (Ind. Ct. App. 1995) (emphasis added; citations and quotations omitted), trans. denied. Moreover, "Indiana Trial Rule 56(F) authorizes but does not require a trial court to order a continuance to permit further discovery." Id.

Kent's argument is, in essence, that, after the Appellees had produced documents pursuant to Kent's first request for the production of documents, some of the Employees testified at their depositions to the existence of other documents that were not produced despite being within the scope of Kent's requests. In particular, on appeal Kent asserts

11

that Smith's deposition[1] demonstrates the Appellees' noncompliance with Kent's first request for the production of documents.

The parties held Smith's deposition on August 8, 2013. During that deposition, Kent's counsel specifically asked Smith if Smith had submitted "all handwritten materials" from 2009 pursuant to Kent's first request for the production of documents.[2] Appellant's App. at 806. Smith responded that he did not know whether he "would even have something that goes back that far" but acknowledged that he had not looked. Id. Kent's counsel then asked Smith if it were likely that Smith had only sent Taulman two e-mails in December of 2009, which was the extent of the Appellees' response to the first request for the production of documents. Smith stated that he did not know how many e-mails he had sent to Taulman in December of 2009 but that it would "surprise" him to learn that he had sent only two. Id. at 809.

In light of Smith's statements, on August 28, 2013, Kent sent a second request for the production of documents to the Appellees. On October 10, the Appellees responded to the second request and stated, in relevant part, that they would "produce documents responsive" to Kent's requests. Id. at 779-95. But just five days after responding to the second request for the production of documents, the Appellees filed their motion for summary judgment.

---

[1] Kent also references Meunier's deposition, but we need not consider it.

[2] These handwritten notes were Smith's reports on the work of the sales staff, which he supervised. At some point, T.K.O. Enterprises shifted to using computers.

12

On November 26, 2013, Kent filed his motion to compel. In his motion to compel, Kent moved the court to:

> 1.    . . . order Defendants to produce the computers used by [Taulman, Smith, and Hurley] during the years 2009, 2010, and 2011, as well as the hard drive containing all T.K.O. emails . . . so that Plaintiff, through a third-party designee, may copy the hard drives and inspect the contents, under and pursuant to the terms of an appropriate protective order, if one is requested . . . .
>
> 2.    . . . order Defendants to produce the documents identified in [first request] No. 16 ([Smith's handwritten] notes) . . . .
>
> 3.    . . . order production of the documents identified in [second request] No. 9 ([Smith's] Call Reports) . . . .
>
> 4.    . . . order Defendants to produce the personal financial documents described in [second r]equest Nos. 11, 12, 13, 14, and 15 . . . .

Id. at 694.

The Appellees responded to the motion to compel with their renewed request for a protective order, which the court later granted as follows:

> Defendants are not obligated to produce the computers subject to Request for Production Nos. 6-8 (Set Two), except that, if Plaintiff elects to inspect them, he must do so: (1) utilizing the services of a third-party vendor agreeable to Defendants; (2) at his own expense; (3) subject to a protocol ensuring that Defendants' privileged, confidential, irrelevant, and other materials not subject to discovery remain protected; and (4) in a manner that does not disrupt the business operations of the Corporate Defendants.

Id. at 1245-46. The court did not address in the protective order Kent's additional requests in his motion to compel, and it denied the motion to compel altogether a few days after it had entered summary judgment for the Appellees. While the court did not explain its rationale for denying the motion to compel, the timing of the court's order

13

suggests it deemed the motion to compel moot in light of the court's order on summary judgment.

It is clear from the record that, at the time the Appellees filed their motion for summary judgment and at the time the court entered summary judgment, discovery was pending. The Appellees filed their motion for summary judgment just five days after they had responded to Kent's second request for the production of documents. And, in their response, the Appellees informed Kent that they would produce numerous documents requested. Further, just a few weeks before the court's summary judgment hearing, the court ordered the Appellees to grant Kent access to their computers so long as Kent followed a procedure specified by the court in its order.[3] And, at the January 21 hearing, counsel for the Appellees acknowledged that discovery was pending and that the parties were trying "to line . . . up" having Kent review Smith's notes, which they had only recently "made available for inspection and copying." Tr. at 6.

Because discovery was pending, as a general rule it was "improper to grant summary judgment." Mut. Sec. Life Ins. Co., 659 N.E.2d at 1103. We thus consider whether the "pending discovery is unlikely to develop a genuine issue of material fact." Id. Pending discovery is unlikely to develop a genuine issue of material fact, for example, when the information sought is not related to the dispositive issue on summary judgment. See Diaz v. Carpenter, 650 N.E.2d 688, 693 (Ind. Ct. App. 1995) ("Even if the

_____

[3] The Appellees assert that the protective order did not mandate them to turn over the computers. The Appellees are mistaken. The court did not order the Appellees to grant Kent unfettered access to the computers, but it did order them to permit Kent access to the computers if Kent follows the procedure specified by the court.

14

interrogatories would have disclosed such disputes of fact, the disputes are immaterial to the arguments associated with the motion for summary judgment, which centered on the statute of limitations . . . ."); see also Quiring v. GEICO Gen. Ins. Co., 953 N.E.2d 119, 132 (Ind. Ct. App. 2011) ("The only issue as to which Quiring requested additional time for discovery was whether the Johnston policy was an Indiana or an Oklahoma policy. As explained above, that issue is immaterial in light of our conclusion that the trial court properly granted summary judgment that Quiring was not a resident of Johnston's household.").  A trial court also does not abuse its discretion in entering summary judgment despite pending discovery when it appears that the party seeking discovery is doing so merely to delay summary judgment.  See, e.g., Frohardt v. Bassett, 788 N.E.2d 462, 473 (Ind. Ct. App. 2003) (rejecting the requesting party's attempt to depose a witness only after that witness had submitted an affidavit that was designated in support of the motion for summary judgment), trans. denied; see also Mut. Sec. Life Ins. Co., 659 N.E.2d at 1103 (holding that the trial court did not abuse its discretion when it entered summary judgment after "nearly a year" had passed between the last discovery request and the motion for summary judgment).

The information sought by Kent's motion to compel was within the scope of some of Kent's claims, and the Appellees do not suggest a basis for summary judgment on these claims that is wholly apart from the pending discovery.  In particular, Kent claimed that Taulman breached his fiduciary duties and committed fraud at the December 21, 2009, meeting when, according to Kent, Taulman knowingly withheld material

15

information regarding T.K.O. Enterprises' financial outlook for 2010.[4] For the same reasons, Kent alleged actual fraud claims against the Employees.

There is no dispute between the parties that T.K.O. Enterprises is a close corporation.[5] "Consequently, shareholders in a close corporation stand in a fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the corporation and with their fellow shareholders." DiMaggio v. Rosario, 950 N.E.2d 1272, 1275 (Ind. Ct. App. 2011). This includes a duty "to make disclosure of all essential information." Cressy v. Shannon Cont'l Corp., 177 Ind. App. 224, 229, 378 N.E.2d 941, 945 (1978) (quotations omitted). As Taulman was a fellow shareholder at the December 21, 2009, meeting, these duties applied to him. As noted in more detail below, however, the Employees, who were not yet shareholders at that meeting, were not subject to these duties.

Kent also alleged actual fraud against Taulman and the Employees. The elements of actual fraud are: (1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; (3) which caused the complainant to rely on the misrepresentation to the complainant's detriment. Ohio Farmers Ins. Co. v. Ind. Drywall & Acoustics, Inc., 970 N.E.2d 674, 684 (Ind. Ct. App. 2012), trans. denied. And we agree with the Appellees that a claim for actual fraud may not be predicated on "a failure to disclose facts where information is as accessible to one as to the other and truth

---

[4] We agree with the Appellees that Kent's direct claims against Taulman and the Employees are limited to their representations or omissions with respect to T.K.O. Enterprises.

[5] A close corporation is "one that typically has relatively few shareholders and whose shares are not generally traded in the securities market." Melrose v. Capitol City Motor Lodge, Inc., 705 N.E.2d 985, 990 (Ind. 1998).

16

is ascertainable by exercise of reasonable diligence." Neff v. Ind. State Univ. Bd. of Trustees, 538 N.E.2d 255, 259 (Ind. Ct. App. 1989) (citing Stucco Cotton Duster Co. v. Comet Elec. Co., 95 Ind. App. 672, 680, 180 N.E. 185, 188 (1932)), trans. denied.

In support of their motion for summary judgment, the Appellees argued, in relevant part, that summary judgment was appropriate for Taulman on the claim that he had breached his fiduciary duties because Kent knew that T.K.O. Enterprises' 2010 financial prospects were speculative and, therefore, Indiana's Business Judgment Rule protects Taulman from liability. Similarly, on Kent's fraud claims the Appellees argued that summary judgment in their favor was appropriate both because Kent knew of T.K.O. Enterprises' dire financial situation and because Kent "had equal access to the 2010 sales projections . . . ." Appellant's App. at 99 (quotation omitted).

But the pending discovery is relevant to whether Taulman or the Employees deliberately hid information from Kent regarding T.K.O. Enterprises' 2010 financial outlook. And because intent is an open question, the Indiana Business Judgment Rule does not apply. See TP Orthodontics, Inc. v. Kesling, 15 N.E.3d 985, 991 (Ind. 2014) (recognizing that the Business Judgment Rule does not apply to claims based on reckless or willful misconduct).

Neither was Kent's motion to compel the result of a lack of diligence in discovery or otherwise merely an attempt to delay summary judgment. Kent served interrogatories on the Appellees with his complaint. After some discovery disputes and the production of at least some relevant information, the parties proceeded to depositions. The parties held Smith's deposition on August 8, 2013, during which Kent learned that the Appellees

17

had not fully responded to the original production requests. Kent then served the Appellees with supplemental discovery requests on August 28, and, on October 10, the Appellees stated that they would "produce documents responsive" to Kent's supplemental requests. Appellant's App. at 779-95. Nonetheless, five days later the Appellees moved for summary judgment. And relevant discovery continued throughout the summary judgment proceedings. These facts are a far cry from cases in which we have affirmed the trial court's entry of summary judgment because the party seeking discovery had been dilatory. See, e.g., Frohardt, 788 N.E.2d at 473; Mut. Sec. Life Ins. Co., 659 N.E.2d at 1103.

It is not for the trial court or this court to assume that the pending discovery, once produced, will fail to support Kent's allegations. All that matters for the instant proceedings is that Kent's requests were relevant to the arguments made on summary judgment on the issues discussed above and that Kent's pursuit of discovery has been reasonably diligent. Accordingly, the trial court abused its discretion when it denied Kent's motion to compel. For the same reasons, we reverse the trial court's entry of summary judgment on Kent's claims against Taulman for Taulman's alleged breach of his fiduciary duties as well as Kent's claims against Taulman and the Employees for actual fraud.

**Issue Two: Summary Judgment on Kent's Other Claims**

We next consider whether the trial court erred when it entered summary judgment for the Appellees on the remainder of Kent's claims, which are either outside the scope of the pending discovery or can be decided on a basis independent of the pending discovery.

18

As stated above, our supreme court recently reaffirmed our standard of review in summary judgment appeals:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Williams v. Tharp, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." Id. (internal citations omitted).
>
> The initial burden is on the summary-judgment movant to "demonstrate[] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact. Id. at 761-62 (internal quotation marks and substitution omitted). And "[a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court."[6] McSwane v. Bloomington Hosp. & Healthcare Sys., 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted).

Hughley, 15 N.E.3d at 1003 (alterations original to Hughley).

Again, we emphasize that summary judgment is a "high bar" for the moving party to clear in Indiana. Id. at 1004. "In particular, while federal practice permits the moving

_____

[6] In another recent opinion, the Indiana Supreme Court stated that an appellee had "the burden of proof on appeal" where the appellate court "st[oo]d in the trial court's shoes" and the appellee was the party with the burden of proof to the trial court. Ind. State Ethics Comm'n v. Sanchez, ___ N.E.3d ___, 2014 WL 5285657, at *2 & n.1 (Ind. Oct. 16, 2014). This language suggests that the Appellees here likewise carry the burden on appeal because, "[w]hen appellate courts review the grant or denial of summary judgment, the reviewing court stands in the shoes of the trial court and applies the same methodology." Smith v. Delta Tau Delta, Inc., 9 N.E.3d 154, 160 (Ind. 2014). But the appellee in Sanchez had originally appealed an adverse agency action to the trial court. The agency then appealed the trial court's judgment to this court and the Indiana Supreme Court. We decline to read the language from Sanchez to apply outside of that fact-specific context, and we instead follow our supreme court's other guidance that the appellant in a summary judgment appeal carries the burden of persuasion on appeal. Hughley, 15 N.E.3d at 1003.

party to merely show that the party carrying the burden of proof [at trial] lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively 'negate an opponent's claim.'" Id. at 1003 (quoting Jarboe, 644 N.E.2d at 123). Further:

> Summary judgment is a desirable tool to allow the trial court to dispose of cases where only legal issues exist. But it is also a "blunt . . . instrument" by which the non-prevailing party is prevented from having his day in court. We have therefore cautioned that summary judgment is not a summary trial and the Court of Appeals has often rightly observed that it is not appropriate merely because the non-movant appears unlikely to prevail at trial. In essence, Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims.

Id. at 1003-04 (citations and some quotations omitted; omission original to Hughley). Thus, for the trial court to properly grant summary judgment, the movants must have made a prima facie showing that their designated evidence negated an element of the nonmovant's claims, and, in response, the nonmovant must have failed to designate evidence to establish a genuine issue of material fact. See Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1270 (Ind. 2009). With these principles in mind, we address Kent's remaining claims against the Appellees.

Summary Judgment for Taulman

We first consider Kent's remaining claims against Taulman, who, along with Kent, was the only other shareholder at the December 21, 2009, meeting. Aside from his claims that Taulman breached his fiduciary duties and committed fraud at the December 21, 2009, meeting, which we have resolved above, Kent also alleges that Taulman

20

breached a fiduciary duty when he terminated Kent's employment[7] and that Taulman defamed Kent when Taulman told his former spouse that he had fired Kent because Kent "never worked." Appellant's App. at 24.

On each of these claims, the Appellees asserted both that Kent's termination was for good cause and that Taulman had told the truth when he said Kent why he had fired Kent. See, e.g., Gatto v. St. Richard Sch., Inc., 774 N.E.2d 914, 924 (Ind. Ct. App. 2002). In support, the Appellees designated Taulman's affidavit, in which he explained that he had fired Kent because Kent left work before the end of work days, failed to keep regular hours, failed to report to McClellan and other supervisors, and failed to work billable positions. The Appellees' designated evidence negated an element of Kent's claim that Taulman breached a fiduciary duty when he fired Kent, and the designated evidence established a prima facie case that the Appellees had an affirmative defense to Kent's defamation claim. As such, the Appellees were entitled to judgment as a matter of law on these claims unless Kent designated evidence to show a genuine issue of material fact that precluded the entry of summary judgment.

In his response, Kent did not challenge Taulman's affidavit with designated evidence that clearly disputed Taulman's affidavit. Rather, Kent simply argued that Taulman's credibility is an issue of fact and that Kent was fired either in furtherance of a vengeful scheme or because no one liked him. But, either way, Kent cannot undermine

---

[7] We assume for the sake of argument that this is a cause of action on these facts even though there is no dispute that Kent was an at-will employee. See W&W Equipment Co. v. Mink, 568 N.E.2d 564 (Ind. Ct. App. 1991), trans. denied. Further, insofar as Kent alleged this claim against the Employees, for the same reasons summary judgment is appropriate for Taulman it is appropriate for the Employees.

the summary judgment movant's designated evidence by simply speculating that an affiant lacks credibility. If what Taulman stated in his affidavit were untrue, Kent could say so in his own affidavit and avoid summary judgment.[8] See Hughley, 15 N.E.3d at 1003 (stating that it is "accurate" that "summary judgment [may] be precluded by as little as a non-movant's 'mere designation of a self-serving affidavit.'" (quoting Deuitch v. Fleming, 746 N.E.2d 993, 999-1000 (Ind. Ct. App. 2001), trans. denied)). While a minimum showing is sufficient, more than a mere supposition is required. A supposition is not designated evidence and can neither mandate nor preclude the entry of summary judgment. Thus, we affirm the trial court's entry of summary judgment on these claims against Taulman.

### Summary Judgment for the Employees

We next consider Kent's nonfraud claims against the Employees. As with Taulman, Kent asserts that each of the Employees—McClellan, Hurley, Meunier, and Smith—breached their fiduciary duties at the December 21, 2009, meeting when they did not adequately inform Kent of T.K.O. Enterprises' business outlook for 2010. But unlike Kent's claim against Taulman, Kent's claims against the Employees are baseless.

The Appellees' designated evidence is undisputed and shows that, at the December 21, 2009, meeting, the Employees were not shareholders but, as our reference to them makes clear, mere employees of T.K.O. Enterprises. Unlike the fiduciary duties

---

[8] Instead, Kent cites nine pages of the record in support of his argument that Taulman did not fire him in good faith and defamed him. But none of those pages supports Kent's position. Indeed, one of the pages is from Kent's deposition, in which Kent admits that he had no idea if he actually worked a billable position. See Appellant's App. at 250.

shareholders have to each other, "[a]n employee owes his employer a fiduciary duty of loyalty." SJS Refractory Co. v. Empire Refractory Sales, Inc., 952 N.E.2d 758, 768 (Ind. Ct. App. 2011). For example:

> an employee who plans to leave his current job and go into competition with his current employer must walk a fine line. Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer. An employee may make arrangements to compete with his employer, such as investments or the purchase of a rival corporation or equipment. However, the employee cannot properly use confidential information specific to his employer's business before the employee leaves his employ. These rules balance the concern for the integrity of the employment relationship against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty.

Id. (citations omitted). But Kent was not the Employees' employer; T.K.O. Enterprises was. The Employees owed Kent no fiduciary duties and, as such, the trial court properly entered summary judgment for the Employees on these claims. However, as explained above, Kent's fraud claims against the Employees remain alive.

<u>Summary Judgment for the T.K.O. Companies</u>

Last, we consider Kent's shareholder derivative claims against the T.K.O. Companies. In particular, Kent asserts that some of the T.K.O. Companies lease property below fair rental value to other T.K.O. Companies or their customers. Kent also asserts that T.K.O. Enterprises and SCS employ three ghost employees: Taulman, Sr. (Taulman's father), Sheila Nelson (Taulman's significant other), and Amy Smith (Smith's wife).

As our supreme court has explained:

23

Derivative actions . . . are suits "asserted by a shareholder on the corporation's behalf against a third party . . . because of the corporation's failure to take some action against the third party." They are brought "to redress an injury sustained by, or enforce a duty owed to, a corporation." Derivative actions are brought in the name of the corporation and are governed by Trial Rule 23.1 and Indiana Code section 23-1-32-1. To bring a derivative action a shareholder must satisfy four requirements. They are: (1) the complaint must be verified; (2) the plaintiff must have been a shareholder at the time of the transaction of which he complains; (3) the complaint must describe the efforts made by the plaintiff to obtain the requested action from the board of directors; and (4) the plaintiff must fairly and adequately represent the interests of the shareholders.[9] Examples of actions that are typically required to be brought derivatively include actions to recover for loss of a corporate opportunity, to recover corporate waste, and to recover damages to a corporation caused by an officer or director's self-dealing.

G&N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 234-35 (Ind. 2001) (emphasis added; citations omitted; second omission original).

The Appellees first assert that they are entitled to judgment as a matter of law because Kent failed to describe in his complaint the efforts he made to obtain the requested action from the T.K.O. Companies. But this argument is different from the argument the Appellees made to the trial court. There, the Appellees argued that Kent had failed to present a factual basis to demonstrate the efforts he had made to obtain relief from the T.K.O. Companies. See Appellant's App. at 1257-58 ("Plaintiff mistakenly characterizes this argument as an attack on the pleadings, completely overlooking the fact that he is obligated to designate evidence creating a question of fact as to whether he

---

9 The parties do not dispute in this appeal whether Kent fairly and adequately represents the interests of the shareholders, and, therefore, we will not consider it. But we note that, where a shareholder has "participated in the wrong complained of," that shareholder may not bring a derivative action. Dotlich v. Dotlich, 475 N.E.2d 331, 339 (Ind. Ct. App. 1985), trans. denied, abrogated on other grounds, State Bd. of Tax Comm'rs v. Town of St. John, 751 N.E.2d 657, 660 (Ind. 2001).

actually <u>made</u> a pre-suit demand or whether it would have been futile to do so."). On appeal, however, they argue only that Kent's complaint, standing alone, is materially defective.[10]  <u>See</u> Appellees' Br. at 37-38.  The Appellees may not raise a new argument for the first time on appeal, even in an appeal from a summary judgment.  <u>Clark Cnty. Drainage Bd. v. Isgrigg</u>, 963 N.E.2d 9, 19 n.4 (Ind. Ct. App. 2012), <u>aff'd on reh'g</u>, 966 N.E.2d 678.  And they certainly cannot make an argument they expressly disavowed to the trial court.

While the difference in these two arguments may appear to be slight, it is significant in its consequences.  Compliance with Trial Rule 23.1 in the pleadings is required, but an alleged error in another party's compliance must be preserved by "an objection [that is] specific as well as timely."  <u>Harp v. Ind. Dep't of Highways</u>, 585 N.E.2d 652, 659-60 (Ind. Ct. App. 1992).  The Appellees do not demonstrate to this court where any such objection, if it exists, might be found in the record.  Ind. Appellate Rule 46(A)(8)(a).  As such, we do not consider their argument under Trial Rule 23.1.

We next address the Appellees' assertion that they are entitled to summary judgment on the merits of Kent's shareholder derivative claims.  Again, as the summary judgment movants, they had the initial burden to designate evidence to affirmatively negate an element of Kent's claims.  <u>Hughley</u>, 15 N.E.3d at 1003.  The Appellees have not met this burden.

---

[10]  We assume the Appellees shifted their argument in light of the fact that, as the summary judgment movants, it was their obligation to designate evidence to negate Kent's claims, not Kent's obligation to support them.  <u>Hughley</u>, 15 N.E.3d at 1003.

25

Regarding Kent's claims that T.K.O. Commercial leases property below fair rental value to T.K.O. Enterprises, the Appellees designated evidence that, "from January of 2009 through mid-2013, [T.K.O.] Enterprises paid . . . nearly $1,000,000 in rent to [T.K.O.] Commercial." Appellees' Br. at 39. In response to Kent's claim that T.K.O. South leases property below fair rental value to either T.K.O. Enterprises or SCS, the Appellees designated evidence that, "[f]rom 2009 through 2012, [T.K.O.] Enterprises paid [T.K.O.] South approximately $2,000 per month in rent, and [SCS] paid . . . approximately $4,000 per month in rent." Appellant's App. at 102. And with respect to Kent's claim on behalf of GTS, the Appellees designated evidence that GTS had allowed customers of T.K.O. Enterprises to store equipment on GTS' property "free of charge to help build and cement a business relationship." Id. at 124. GTS also allowed T.K.O. Enterprises "to temporarily [store] trailers" free of charge "when there is a backlog" at T.K.O. Enterprises' site. Id.

This evidence is all well and good, but neither the total sum of rent paid nor the monthly amounts, standing alone, say anything about the fair rental value. Likewise, GTS' willingness to allow T.K.O. Enterprises to enhance its good will with its own customers free of charge, or GTS' willingness to store T.K.O. Enterprises' excess trailers on GTS' property free of charge, does not negate an element of Kent's claims. Absent an affirmative showing by the Appellees that T.K.O. Enterprises, SCS, and/or GTS[11]

---

[11] We highly doubt that Kent is a fair and adequate representative on behalf of GTS. Again, GTS is 50% owned by T.K.O. Enterprises, 25% owned by Meunier, and 25% owned by Smith. Thus, Kent's standing with respect to GTS is entirely through his interest in T.K.O. Enterprises. But the actions of GTS that Kent complains of were to the benefit of T.K.O. Enterprises and, therefore, Kent. Nonetheless,

received fair value in exchange for the use of their property, the Appellees have not met their burden to negate an element of these derivative claims. See Hughley, 15 N.E.3d at 1003.

We next consider the Appellees' assertion that they are entitled to summary judgment on Kent's derivative claims of ghost employment. Again, in his complaint Kent alleged that Taulman, Sr. and Nelson were ghost employees of T.K.O. Enterprises and that Amy Smith was a ghost employee of SCS. We first note that the parties do not define "ghost employment" in a civil context, and they do not direct this court to any authority on this point. Nonetheless, they likewise do not dispute that a shareholder derivative claim for ghost employment may lie either if an employee is paid for work not actually performed by that employee or if the employee is paid an amount that is grossly disproportionate to that employee's job responsibilities.

On these claims, the Appellees designated Taulman's affidavit in support of their motion for summary judgment. According to Taulman's affidavit:

> 33. As a part of his sale of shares upon his exit from ownership of [T.K.O. Enterprises], Tom Taulman Sr. was retained as a consultant for his continued assistance with the companies. Among other duties, he collects and distributes company mail, he makes bank deposits, and he runs other assorted errands on an as-needed basis.
>
> 34. Sheila Nelson works in sales at [T.K.O. Enterprises]. Her compensation is composed of a base salary, commissions on sales, and bonuses. In 2009 she generated over $280,000 in sales; in 2010 she generated over $370,000 in sales; and in 2011 she generated over $380,000 in sales. . . .

---

as noted above the parties did not argue this position to either this court or the trial court, and we do not consider it.

35.     Amy Smith was retained by [SCS] as an Independent accounts Payable/Accounts Receivable consultant.  Her job responsibilities include: entering into QuickBooks payables to outside vendors; preparing checks to outside vendors; entering checks paid to outside vendors in QuickBooks; billing; reconciling company bank statements; assisting in the preparation of quarterly and year-end financials; [and] clerical duties as needed.  In exchange, she is paid a consulting fee of $500 per week.

Id. at 122-23.  The Appellees further designated evidence that, between 2007 and 2012, Taulman, Sr. was paid between $1,957.50 and $57,166.63 for the work described in Taulman's affidavit.

We agree with Kent that this evidence is not sufficient to negate an element of his claim that these three employees were ghost employees.  Absent designated evidence by the summary judgment movant that demonstrates that an alleged ghost employee was paid only for services he actually performed[12] and was paid an amount not grossly disproportionate to those services,[13] the summary judgment movant cannot make a prima facie showing that it is entitled to judgment as a matter of law on a derivative claim of ghost employment.  See Hughley, 15 N.E.3d at 1003.  Thus, the trial court erred when it entered summary judgment for the Appellees on these claims.

---

[12] While we need not consider it, in his response to the Appellees' motion for summary judgment on this issue Kent designated Meunier's deposition.  At that deposition, Meunier testified that Nelson had been paid sales commissions based on sales procured by Taulman.  The parties do not dispute that Taulman did not receive a commission based on his sales.

[13] If anything, the Appellees' designated evidence that Taulman, Sr. was paid up to $57,166.63 for "collect[ing] and distribut[ing] company mail, . . . mak[ing] bank deposits, and  . . . other assorted errands on an as-needed basis" suggests the opposite.  Appellant's App. at 122.

28

**Conclusion**

We hold that the trial court abused its discretion when it denied Kent's motion to compel. As such, we reverse the trial court's entry of summary judgment for the Appellees on Kent's claim that Taulman had breached his fiduciary duties to Kent at the December 21, 2009, meeting and on Kent's fraud claims against Taulman and the Employees.

As to Kent's other claims, we hold that the Appellees are entitled to judgment as a matter of law on Kent's defamation claim against Taulman and on Kent's claim that Taulman breached a fiduciary duty when he fired Kent. We also hold that the Appellees are entitled to judgment as a matter of law on Kent's claims that the Employees breached their fiduciary duties. However, we hold that the Appellees failed to designate evidence to negate at least one element of Kent's shareholder derivative claims. Thus, we affirm in part, reverse in part, and remand for further proceedings.

Affirmed in part, reversed in part, and remanded with instructions.

BAILEY, J., and PYLE, J., concur.

29