## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 07 2017, 5:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Edward R. Hannon
Steuerwald Hannon & Witham, LLP
Danville, Indiana

ATTORNEYS FOR APPELLEES

Michael B. Langford
Braden K. Core
Paul D. Root
Scopelitis, Garvin, Light,
Hanson & Feary, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Kent Smith,

*Appellant-Plaintiff,*

v.

Thomas L. Taulman, II; Thomas McClelland; Christina R. Hurley; Gary R. Meunier; Denny D. Smith; T.K.O. Enterprises, Inc.; T.K.O. Commercial Development, LLC; SCS Fleet Services, LLC; GTS Properties, LLC; and T.K.O. South, LLC,

*Appellees-Defendants*

February 7, 2017

Court of Appeals Case No.
32A01-1605-PL-1013

Appeal from the Hendricks Superior Court

The Honorable Stephanie LeMay-Luken, Judge

Trial Court Cause Nos.
32D05-1207-PL-82
32D05-1510-PL-154

**Baker, Judge.**

[1] This appeal is a continuation of an action in which this Court has already ruled. T.K.O. Graphix, a closely held business, suffered financially during the economic downturn that began in 2008. Michael Kent Smith ("Kent") was a minority shareholder in the business. As the company worked to stay profitable, Kent's ownership in the company was significantly reduced, and eventually his employment was terminated. In 2011, Kent filed a lawsuit against the company's majority owner, Thomas L. Taulman, II ("Taulman") and four of the company's employees, alleging fraud and breach of fiduciary duty. After losing on summary judgment, Kent appealed. This Court reversed the trial court's entry of summary judgment on Kent's claims, finding that additional discovery was needed. In 2015, Kent filed a second lawsuit, alleging additional breaches of fiduciary duty by Taulman and the four employees. The trial court consolidated the two cases. The Appellees moved for summary judgment a second time, and the trial court granted it in their favor.

[2] Kent now appeals, arguing that the trial judge should have recused herself, that his two actions should not have been consolidated, and that summary judgment should not have been granted to the Appellees. Finding that the trial judge was not required to recuse herself, that the two actions were properly consolidated, and that summary judgment was properly granted, we affirm.

# Facts[1]

This Court's first opinion in this matter establishes the following facts:

> In 1985, Thomas L. Taulman, Sr., Taulman, and Kent formed T.K.O. Enterprises. T.K.O. Enterprises is a full-service graphics firm, and its work includes the design, manufacture, installation, and removal of graphics on trailers used in the trucking industry. Each of the three men owned T.K.O. Enterprises in equal one-third shares. Eventually, Taulman, Sr. sold some of his shares back to the company and transferred the remainder of his shares to his son, Taulman. From 2000 to late 2009, Taulman owned about 52% of the shares of T.K.O. Enterprises, and Kent owned the remaining shares, or about 48%.

> Although Taulman, the President of T.K.O. Enterprises, was actively engaged in the management and promotion of the business, it is not clear that Kent had any specific job description. Rather, Kent was the Vice President, and he would help with various odds-and-ends around the company. Nonetheless, Taulman and Kent shared in the profits, and their respective incomes were based upon their ownership interests.

> Over time, T.K.O. Enterprises expanded through the creation of the T.K.O. Companies, in particular:

> - T.K.O. Commercial, which owns and manages certain real property and is owned equally by Taulman and Kent;
> - SCS, which removes decals from and cleans semi-trailers and is equally owned by Taulman, Kent, Meunier, and Smith;

---

[1] We heard oral argument on December 19, 2016, at Mississinewa High School. We thank the school's administration, faculty, staff, and students for their hospitality. We also thank counsel for their oral argument and subsequent discussion with the students.

- GTS, which owns and manages certain real property and is 50% owned by T.K.O. Enterprises, 25% owned by Meunier, and 25% owned by Smith; and

- T.K.O. South, which owns and manages certain real property and is wholly owned by T.K.O. Enterprises.

Between 2005 and 2009, Taulman and Kent discussed having Kent sell his shares in T.K.O. Enterprises, but no agreement was reached. In 2009, T.K.O. Enterprises suffered substantial losses in business and faced bankruptcy. In June of that year, Huntington Bank ("Huntington") downgraded its relationship with T.K.O. Enterprises to "substandard" due to poor financial performance, which placed T.K.O. Enterprises' line of credit with Huntington in jeopardy. On September 11, Tina Magyar, T.K.O. Enterprises' Controller, e-mailed Taulman and Kent to tell them that T.K.O. Enterprises was almost completely unable to meet its financial obligations.

Shortly thereafter, Taulman invested $50,000 of his own money in T.K.O. Enterprises to cover operating expenses. Taulman asked Kent to make a similar investment. Kent declined. Instead, Kent agreed to reduce his annual salary from $120,000 to $50,000, and he agreed to condition his employment on working "a billable position." In working a billable position, Taulman informed Kent that Kent's job requirements would include reporting to [Thomas] McClellan or another assigned supervisor each week for specific instructions to help where needed, and that Kent would "have to be accountable for [his] work."

On October 5, 2009, T.K.O. Enterprises' line of credit with Huntington expired, and the bank refused to automatically renew it. Also in October, Taulman sought to have a new investor, Terry Dillon, buy out Kent's shares in T.K.O. Enterprises. Taulman discussed this plan with Kent, and Kent agreed. But Huntington informed Taulman that it would not renew the line

of credit even if Dillon bought out Kent, and the deal fell through.

Although facing tough market conditions, T.K.O. Enterprises, through Taulman and the rest of its sales staff, continued to pursue potential customers throughout 2009. In particular, in mid-2009 T.K.O. Enterprises began to engage TruGreen, a nationwide provider of residential and commercial lawn and landscape services, in what "had the potential to be a large account representing a sizeable volume of sales in 2010." Kent was aware of T.K.O. Enterprises' attempt to secure a contract with TruGreen. In November of 2009, TruGreen selected T.K.O. Enterprises to demonstrate its products in a pilot program. Taulman informed Kent of this development.

Throughout this time T.K.O. Enterprises faced the prospect of bankruptcy. Taulman requested Kent to make a capital contribution on several occasions, which Kent declined to do. Kent was included on monthly e-mails that provided detailed reports on T.K.O. Enterprises' weak financial condition. Kent, a guarantor to T.K.O. Enterprises' line of credit, discussed having T.K.O. Enterprises "shut the doors to be able to pay vendors, pay our taxes, and walk away without filing personal bankruptcy." Kent's understanding of the TruGreen negotiations, among others, was that there was "nothing to count on for me to invest money in the company" because the company "was not going to make it." Indeed, in late 2009, Kent told Taulman, [Christina] Hurley, and [Denny] Smith that, even if the company landed the TruGreen account, T.K.O. Enterprises should "do the TruGreen job if it comes in and then shut . . . down."

On December 16, 2009, Taulman issued a notice of a special meeting of the board of directors to be held on December 21, which was also the date of T.K.O. Enterprises' annual shareholders meeting. According to the notice, new and additional shares in T.K.O. Enterprises would be offered, and

Taulman was to receive 52% of those shares in exchange for his earlier $50,000 investment. Kent was to be given the option to purchase the remaining 48% of the new shares at the meeting.

Taulman attended the meeting on December 21 as President of T.K.O. Enterprises. Kent attended as Vice President. Hurley attended as Secretary. Also present were McClellan, [Gary] Meunier, and Smith, high-ranking employees of T.K.O. Enterprises whom Taulman had invited. Kent had been informed before the meeting that Hurley, McClellan, Meunier, and Smith were each willing to invest up to $25,000 in T.K.O. Enterprises.

At that meeting, Kent asked "everyone's opinion of why they would invest into the company" and stated that he was concerned with the future of the company. Hurley's handwritten minutes of the meeting do not reflect any statements about TruGreen. However, the official minutes, which were prepared subsequent to the meeting by Taulman and reviewed and signed by Hurley as consistent with her recollection, reflect that Taulman stated at the meeting that "TruGreen was about 90% sure, but no signed purchase order at the time." And Hurley recorded that at least three other accounts were discussed, along with Smith stating that he thought the "industry was coming back" and McClellan stating there had been a small upswing in sales. Meunier then added that he "feels very strongly about the company and his future"; McClellan stated that he "believes in himself and work ethic" and that he "would take the gamble to keep his job"; and Hurley stated that she "wanted to keep what she had at T.K.O." because she "believed in the company."

Kent did not think the others had presented any information that "would benefit the company. There was nothing really to bank on. As such, he agreed to waive his right to purchase the new shares and agreed to reduce his total shareholdings to 9.8% in T.K.O. Enterprises. Hurley, McClellan, Meunier, and Smith

each then purchased 9.8% of T.K.O. Enterprises. Taulman remained the majority shareholder with 51% of the total shares. The parties' agreement became effective on December 22, 2009.

In March of 2010, TruGreen awarded its contract for graphics services to T.K.O. Enterprises. Largely as a result of this contract, T.K.O. Enterprises' sales in 2010 were the highest in its history. In July of 2010, Taulman fired Kent for leaving work before the end of work days, failing to keep regular hours, failing to report to McClellan and other supervisors, and failing to work billable positions.

On December 19, 2011, Kent filed his complaint against the Defendants. In his complaint, Kent alleged that Taulman and the Employees had breached fiduciary duties owed to Kent and that they had committed fraud at the December 21, 2009, meeting. . . .

During discovery, Kent requested the Defendants to produce "all communications they shared with one another as well as communications they shared with the company's bankers and customers." . . . .

One document produced was a December 28, 2009, letter from Taulman to Huntington in which Taulman described the following outlook for 2010:

> I feel 100% sure we will get the large order [with TruGreen] soon . . . .
>
> * * *
>
> . . . As for projecting out the next 6 months, January and February are usually slow months but we are seeing good

activity with the 2 semi trailer factories (Great Dane) that we do business with. Our fleet customers are saying that their maintenance costs are killing them and it would be cheaper to have new equipment than what it is costing them to keep their existing equipment. They are starting to request bids from us and some have decided to buy

now. . . . Simon Mall is one of our accounts and we are currently bidding some large projects for them. . . . With all the new accounts we have landed this year and with one of our biggest competitors . . . being bought and closed down this year too we have gained a lot more of the market share. . . . As for what I can predict in the next 6 months, I think that January and February are break even months, March, April, May and June I believe will be profitable . . . and with TruGreen beginning in early 2010, I think that April and May could be even bigger. . . . If for any reason TruGreen is delayed or doesn't happen . . . we will still make money with our current accounts that we have for the next 6 months. . . .

Among other things, the Great Dane account was not an account raised by either Taulman or the [Individual Defendants] in response to Kent's questions at the December 21, 2009, meeting.

[4] *Smith v. Taulman*, 20 N.E.3d 555, 560-63 (Ind. Ct. App. 2014) (internal citations omitted). Following significant discovery, Kent learned that numerous documents within the scope of his first request for the production of documents had not been produced, and he submitted a second request for the production of documents. The Appellees stated that they would produce documents responsive to his requests. Five days later, on October 15, 2013, the Appellees filed their motion for summary judgment in the First Action. The parties

agreed to allow Kent an extension of time in which to respond to the summary judgment motion. On November 26, 2013, Kent filed a motion to compel discovery. On December 23, 2013, Kent filed his response to the motion for summary judgment. On January 21, 2014, the trial court held a consolidated hearing on the Appellees' motion for summary judgment and on Kent's motion to compel. Following the hearing, the court entered summary judgment in favor of the Appellees on all of Kent's claims and denied Kent's motion to compel.

[5] Kent appealed. In *Smith v. Taulman*, this Court held that the trial court erred when it denied Kent's motion to compel because his discovery requests were relevant to the arguments made on summary judgment involving his fraud and breach of fiduciary duties claims. 20 N.E.3d at 567. For that reason, this Court reversed the trial court's entry of summary judgment on Kent's claims against Taulman for Taulman's alleged breach of fiduciary duties and Kent's claims against Taulman and the Individual Defendants for fraud.[2] *Id.*

[6] Following remand, the parties continued discovery in the First Action, which was being litigated in Hendricks County Superior Court 5. On October 14, 2015, Kent filed the Second Action in Hendricks County Superior Court 2, alleging additional claims of breaches of fiduciary duties against Taulman and the Individual Defendants for their actions after they became official

---

[2] The other issues discussed in our earlier opinion were either affirmed in that opinion or later dismissed by Kent.

shareholders. Specifically, he asserted that Taulman and the Individual Defendants were taking excessive compensation to minimize profits and earnings, thereby depriving Kent of dividends; were knowingly and deliberately operating T.K.O. Enterprises to minimize profits and increase income to other entities principally owned by certain shareholders; and were self-dealing by creating several new entities that provide services identical to SCS and GTS to divert income from T.K.O. Enterprises and from Kent.

[7] On December 3, 2015, the Appellees filed with Superior Court 5 a motion to consolidate the lawsuits under Indiana Trial Rule 42(A). Before the trial court ruled on that motion, the Appellees filed on December 15, 2015, another motion for summary judgment in the First Action in Superior Court 5. In their motion, the Appellees asked that, "in the event that this case is consolidated with the [Second] Action, the Individual Defendants respectfully request summary judgment against Plaintiff Michael Kent Smith on all claims asserted in the [Second] Action." Appellant's App. Vol. 2 p. 65. The Appellees included in their motion arguments for the issues in the Second Action.

[8] On December 22, 2015, the Superior Court 5 granted consolidation for discovery and trial. On December 23, 2015, the Superior Court 2 judge disqualified himself from the case due to a conflict of interest and transferred the case to Superior Court 5. Kent objected to the transfer and requested a selection of special judge. On January 4, 2016, Kent filed a motion to reconsider and vacate the order of consolidation, and he requested a hearing. The trial court denied the motion to reconsider consolidation.

On February 2, 2016, the trial court held a hearing on the second summary judgment motion as it related to both the First Action and the Second Action, and on February 9, 2016, granted summary judgment in favor of the Appellees. On March 10, 2016, Kent filed a motion to correct error and a verified motion for recusal and appointment of special judge. On April 5, 2016, the trial court denied all of Kent's motions. Kent now appeals.

## Discussion and Decision

Kent raises several issues on appeal, which we restate and consolidate as follows: (1) whether the trial judge was required to recuse herself; (2) whether consolidation of the two lawsuits was contrary to Indiana Trial Rule 42; and (3) whether summary judgment was warranted regarding Taulman's and the Individual Defendants' knowledge and representations about T.K.O. Enterprises' financial condition.[3]

## I. Recusal

Kent argues that Judge LeMay-Luken of Hendricks County Superior Court 5 should have recused herself from the case. Specifically, he argues that Judge LeMay-Luken violated Judicial Conduct Rules 1.2, 2.2, 2.3, 2.5, and 2.11 because she did not recuse herself when her conduct appeared impartial.

---

[3] Kent filed a partial motion to dismiss other issues he raised on appeal. This Court granted that motion.

[12]   Indiana Judicial Conduct Rule 1.2 provides that a judge must act in a way that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and must avoid impropriety and the appearance of impropriety. A judge must apply the law and perform all judicial duties fairly and impartially and without bias or prejudice. Jud. Cond. R. 2.2, 2.3. A judge has a duty to perform competently, diligently, and promptly. Jud. Cond. R. 2.5.

[13]   A judge must hear and decide matters assigned to her unless disqualification is required; disqualification is required when the judge's impartiality might reasonably be questioned, including when, among other things, the judge has a personal bias or prejudice concerning a party or party's lawyer, or personal knowledge of the facts that are in dispute in the proceeding. Jud. Cond. R. 2.11. "The question is not whether the judge's impartiality is impaired in fact, but whether there exists a reasonable basis for questioning a judge's impartiality." *Tyson v. State*, 622 N.E.2d 457, 459 (Ind. 1993). Counsel cannot "lie in wait, raising the recusal issue only after learning the court's ruling on the merits." *Id.* at 460 (quotation marks and citation omitted).

[14]   Kent bases his argument on "the combination of rulings that were contrary to law and directly contravened the Court of Appeals' decision in 2014. Specifically, the grant of summary judgment is contrary to the 2014 appellate opinion." Appellant's Br. p. 50. Kent argues that Judge LeMay-Luken should not have granted the Appellees' second motion for summary judgment because Taulman and the Individual Defendants did not present new evidence in their second motion, despite this Court's finding in 2014 that they had not presented

evidence to satisfy their burden for summary judgment. According to Kent, because the trial court judge granted the motion, she failed to act impartially "by failing to follow the Court of Appeals' holding and insolently entering summary judgment again on the same argument that her ruling was reversed upon in 2014." *Id.* Further, Kent contends that Judge LeMay-Luken was not impartial because she failed to apply the correct standard of proof, improperly shifting the burden of proof to Kent, the nonmovant; improperly consolidated the two cases; and withheld a hearing as required by Indiana Trial Rule 42 and as requested by Kent.

[15] Kent's recusal argument is without merit. He relies solely on the fact that the trial court judge ruled against him, but adverse rulings alone are not evidence of bias and do not warrant recusal. *See Voss v. State*, 856 N.E.2d 1211, 1217 (Ind. 2006) ("The mere assertion that certain adverse rulings by a judge constitute bias and prejudice does not establish the requisite showing."). Because Kent has not established a reasonable basis for questioning the trial court judge's impartiality, we find that Judge LeMay-Luken was not required to recuse herself.

## II.  Consolidation

[16] Kent argues that the transfer of the Second Action from Hendricks County Superior Court 2 to Hendricks County Superior Court 5 violated Indiana Trial

Rule 42[4] and was done in error because the cases do not involve a common question of law or fact that is determinative in the actions.

[17] In Hendricks County, an action, cause, proceeding, or other matter filed in the Hendricks Circuit or Superior Court "may be transferred by the court in which it is filed to either of the other courts by transferring all original papers filed with the consent of the court to which it is transferred." Ind. Code § 33-33-32-4. Hendricks County Local Rule 32-AR1 provides that miscellaneous civil cases must be filed in Hendricks Superior Courts 2, 4, or 5. The rule allows for "judges and magistrates of the courts of record in the county to preside over hearings or issue orders for one another in order to promote efficiency and provide for timely resolution of cases." Hendricks County LR-32-AR1.

[18] Indiana Trial Rule 42(A) provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Consolidation is

___

[4] Kent also stated that consolidation violated Indiana Trial Rule 79, which governs selection of a special judge. He did not develop an argument in his brief as to how the trial court violated this rule. However, in his reply brief, he states that the trial rules specify the proper procedure for when trial court judges acknowledge a conflict of interest, as the Superior Court 2 judge did, arguing that "[i]t is not within the judges' discretion to ignore T.R. 79 and transfer the case because Superior Court 5 improperly demanded consolidation." Appellant's Reply Br. p. 10. Because we find that Superior Court 2 was permitted to transfer the Second Action to Superior Court 5, regardless of whether the Superior Court 2 judge had a conflict of interest, we find that Trial Rule 79 does not apply in this case, and a special judge was not required.

proper when the common questions of law or fact are determinative. *Bodem v. Bancroft*, 825 N.E.2d 380, 382 (Ind. Ct. App. 2005).

[19] We find that the Superior Court properly consolidated the two cases under the local rules and Trial Rule 42(A). As Kent notes, Rule 42(A) applies to cases pending in the same court. The First Action was pending in Superior Court 5, and the Second Action was pending in Superior Court 2. Both courts have authority to hear miscellaneous civil cases, and the local rules permit judges to preside over hearings or issue orders for one another; thus, Hendricks County Superior Courts operate as a unified court system in which Superior Courts 2 and 5 share authority and responsibility to hear cases from the other divisions. This means that, as far as Trial Rule 42(A) is concerned, Superior Courts 2 and 5 are the same court. Under Indiana Code section 33-33-32-4 and the local rules, one superior court can transfer an action to another superior court, and once transfer is complete, the superior court presiding over the actions can consolidate them under Trial Rule 42(A).

[20] Consolidation under Trial Rule 42(A) requires common questions of law or fact, and this requirement is met here. Although Kent argues that the two actions involve different allegations, facts, and time frames, we find that they both involve claims of fraud and breach of fiduciary duty between the same parties following the dilution of Kent's shares in December 2009, such that consolidation was proper under Trial Rule 42(A). Cases only need some common question of law or fact to be consolidated; complete overlap is not required. *See Bodem*, 825 N.E.2d at 382 (granting consolidation under Trial

Rule 42(A) of two lawsuits filed by plaintiff against two defendants following two car accidents that took place on different days and in different counties because "the commonality and overlap in alleged injuries presents a common question of fact sufficient to justify consolidation"). In other words, statutory authority and the local rules permitted the Superior Court 2 judge to transfer the Second Action to Superior Court 5, and Trial Rule 42(A) permitted the Superior Court 5 judge to consolidate the two actions.[5]

# III. Summary Judgment

[21] Indiana's summary judgment standard is well established:

> We review summary judgment de novo, applying the same standard as the trial court: Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences.
>
> The initial burden is on the summary-judgment movant to demonstrate the absence of any genuine issue of fact as to a

---

[5] Kent argues that a hearing was required before consolidation could be granted. According to Kent, his two lawsuits were pending in two different courts, making Trial Rule 42(D), which governs consolidation of actions pending in different courts for the purpose of discovery and pre-trial proceedings, the relevant rule. Because we find that the two actions were pending in the same court for purposes of Trial Rule 42, making Trial Rule 42(A), which allows for but does not require a hearing prior to consolidation, the relevant rule for consolidation of these two actions, Kent was not entitled to a hearing before his lawsuits were consolidated in Superior Court 5.

determinative issue, at which point the burden shifts to the non-movant to come forward with contrary evidence showing an issue for the trier of fact. And although the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court.

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (internal quotation marks and citations omitted).

# A. First Action

## 1. Fraud

Kent asserts that summary judgment was not available in the First Action because material facts were in dispute regarding Taulman's and the Individual Defendants' knowledge and misrepresentations about T.K.O. Enterprises' financial condition when Kent's shares were redistributed. Specifically, he asserts that when Taulman and the Individual Defendants moved for summary judgment, they did not disprove Kent's allegations that they failed to disclose all material information when Kent asked for it, nor did they disprove that they made material misrepresentations of their knowledge of prospective sales and T.K.O. Enterprises' improving financial condition. Kent states that if Taulman and the Individual Defendants had reported that the company's financial future was promising, he would have voted against the divestment of shares to them and retained his interest in T.K.O Enterprises.

[24] Kent fails to state exactly how Taulman and the Individual Defendants committed fraud against him or what material facts they failed to disclose. "The essential elements of actual fraud are a *false material representation* of past or existing facts, made with knowledge or reckless ignorance of the falsity, which causes reliance to the detriment of the person relying on the representation." *Comfax Corp. v. N. Am. Van Lines, Inc.*, 587 N.E.2d 118, 125 (Ind. Ct. App. 1992) (emphasis added). Fraud is not limited only to affirmative representations; it can also include the failure to disclose all material facts. *Lawson v. Hale*, 902 N.E.2d 267, 275 (Ind. Ct. App. 2009).

[25] In September 2009, Taulman emailed the bank about the TruGreen account, writing that "I know this is not for sure but I would have to say I feel 95% sure we will land this in the next 30 to 60 days" and "I feel 99% sure we got this but can't guarantee it till I see" a purchase order. Appellant's App. Vol. 5 p. 20, 22. On December 4, 2009, he wrote to the bank, "we did land the TruGreen account but we are doing 1 location in January of 25 vehicles so they can decided [sic] if they use option 1 or 2 on some of the trucks." *Id.* at 24. On December 28, 2009, Taulman sent a long email to the bank about the company's positive financial outlook, writing that they did not have a signed purchase order for the TruGreen project, but "I feel 100% we will get the large order soon"; he also wrote that "[a]s for projecting out the next 8 months, January and February are usually slow months but we are seeing good activity with" Great Dane. *Id.* at 26-28.

[26]     A meeting of T.K.O. Enterprises' shareholders and directors took place on December 21, 2009. Kent, Taulman, and the Individual Defendants were present. The meeting minutes includes the following information:

- Two attendees reported that the "[i]ndustry is coming back."
- Taulman reported "a small upswing in sales, but nothing to bank [o]n. TruGreen was about 90% sure, but no signed purchase order at the [t]ime."
- Taulman "has been talking to multiple banks with no commitment from any."
- Taulman reported that the company had losses around $350,000, and more capital was needed than the $50,000 he had already put into the company.
- Kent stated that he was concerned with the future of the company, and he asked the other attendees why they would invest in the company. In response, Meunier said that "he feels very strongly about the company and [its] future"; McClelland said that "he believes in himself and his work ethics. He would take a gamble to be able to continue his employment at TKO Graphix"; Smith said that he "feels very strongly that TKO Graphix will pull through in this bad economy and become successful again. He is willing to take that risk to help TKO Graphix succeed"; and Hurley said that "she believed in TKO Graphix and would do what she needed to do [to] help TKO Graphix continue."
- Kent said that "at this time he is not putting any money into the company. He wants his name removed off the line. He will go down in stocks, but does not want the risk" and that "he doesn't care about his majority ownership at this point unless you bring someone else in that would have controlling interest."
- Kent said that "he didn't feel he had security in his job at TKO Graphix." Taulman and Smith responded that "no one has a guaranteed position."

*Id.* at 61-63.

[27] This evidence may indicate that the company had potential to survive the national economic recession that was ongoing at the time, but it does not show that Taulman and the Individual Defendants misrepresented past or existing facts or failed to disclose material facts regarding the company's financial future. First, the financial information and prospect of landing the TruGreen account that Taulman shared in his correspondence with the banks aligns with the information that he shared at the board meeting.

[28] Second, although Kent alleges that Taulman and the Individual Defendants did not tell him that the company's financial future was positive, when he asked the Individual Defendants why they would invest in the company, they expressed confidence in the company's ability to survive the economic recession while also acknowledging that continuing to invest in the company was a gamble and a risk. Indeed, the risk was real—the company's sales in 2009 were down 31% from 2008 and down 44% from their 2006 high; sales in December 2009 were down nearly 20% compared to December 2008, and down 49% from their December 2005 high. Yet the Individual Defendants' responses to Kent's question suggest that, despite the uncertainty, they believed that T.K.O. Enterprises could have a promising future. That Kent chose to disregard their positive outlook does not mean that they misrepresented or withheld facts from him, nor will we find that they did so merely because they could not guarantee a certain financial future, which would be unrealistic for any business, even during a good economy.

T.K.O. Enterprises' finances became more secure when the company secured the TruGreen account. Although Taulman exhibited confidence about securing the TruGreen account in December 2009, TruGreen did not formally award T.K.O. Graphix the contract until March 2010; Taulman signed the contract in March 2010 and TruGreen countersigned in April 2010. We find it hard to see how Taulman and the Individual Defendants could have withheld from Kent information about the TruGreen account's impact on T.K.O. Graphix in December 2009, considering that the account was not formally secured until April 2010. Moreover, the record indicates that regardless of whether T.K.O. Enterprises secured the account, Kent wanted out of the business. Despite reports that the industry was bouncing back, that the company had a small upswing in sales, and that the TruGreen account was probable, Kent expressed concern with the company's future and a desire to avoid risk. These concerns suggest that Kent wanted out of the business regardless of its future prospects.

In sum, Kent's fraud claim is based on how the company ended up doing in 2010, not on the past or existing facts related to the company's actions and financial standing as of December 2009. When Kent states that the company's financial situation was improving in December 2009, contrary to what may have been represented to him, he does so with the benefit of hindsight of knowing that the company's financial position did, in fact, improve. A fraud claim cannot be based on future events. "[A]ctual fraud may not be based on representations regarding future conduct, or on broken promises, unfulfilled predictions, or statements of existing intent which are not executed." *Comfax*

*Corp.*, 587 N.E.2d at 125. We find that Kent has failed to allege facts or demonstrate a genuine issue of material fact showing that Taulman and the Individual Defendants falsely represented past or existing facts or withheld material facts related to T.K.O. Enterprises' financial situation. Accordingly, we affirm the trial court's grant of summary judgment on the fraud claims.

## 2. Fiduciary Duty

Kent also argues that Taulman was not entitled to summary judgment on his claim of breach of fiduciary duty because Taulman breached his duty when he knowingly misrepresented T.K.O. Enterprises' financial condition and withheld 2010 sales projects to manipulate Kent into agreeing to redistribute his shares. He refers to his argument for his fraud claims to support his argument that Taulman breached his fiduciary duty.

Under Indiana's business judgment rule, a director of a closely held corporation is not liable for any action taken or not taken as a director, regardless of the nature of the alleged breach of duty, unless the director has breached or failed to perform the duties of the director's office, and the breach or failure to perform constitutes willful misconduct or recklessness. Ind. Code. § 23-1-35-1(e). "A director is not to be held liable for informed actions taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 238 (Ind. 2001). A fiduciary must perform his duties "fairly, honestly, and openly." *Id.* at 239.

Kent's allegations do not overcome the presumption that Taulman acted in good faith and in lawful and legitimate furtherance of corporate purposes. The evidence indicates that Taulman communicated frequently with the company's banks to make the company's financial future more secure in a challenging economy. No evidence shows that Taulman's actions constituted willful misconduct or recklessness. Kent's argument is based on speculation as to what Taulman might have known and what his motivations might have been. Speculation is not sufficient to gain reversal of summary judgment. *See Beatty v. LaFountaine*, 896 N.E.2d 16, 20 (Ind. Ct. App. 2008) (holding that mere speculation, guesses, supposition, and conjecture "are not sufficient to create a genuine issue of material fact to defeat summary judgment."). Therefore, we affirm the grant of summary judgment on this claim.

## B. Second Action

Kent asserts that summary judgment was improper in the Second Action because the Individual Defendants' compensation is excessive, thereby minimizing profits to deprive him of dividends. He also asserts that Taulman and the Individual Defendants engaged in self-dealing by their creation and ownership of several new entities that provide services identical to SCS and GTS in order to divert income away from T.K.O. Companies and from Kent.

To prevail on an excessive compensation claim, a plaintiff-shareholder must show that "the compensation is unjust, oppressive, or fraudulent." *G & N Aircraft, Inc.*, 743 N.E.2d at 239 (quotation marks and citation omitted). "Once

a corporate officer's compensation is challenged, the burden of establishing unreasonable compensation lies with the minority shareholder instituting the action." *Krukemeier v. Krukemeier Mach. & Tool Co.*, 551 N.E.2d 885, 887 (Ind. Ct. App. 1990) (quotation marks and citation omitted).

[36] Kent states that the Appellees, in moving for summary judgment, did not designate evidence that shows that the compensation was reasonable and not excessive. But in an excessive compensation claim, the burden of proof rests on the plaintiff, not on the defendant. Kent states that in 2012, Taulman and the Individual Defendants received $80,000 on the SCS payroll and continue to receive a minimum monthly payment of $1,500. He provides no context for how these payments are unjust, oppressive, or fraudulent. His complaint seems to be based on the fact that he "was never notified of a board meeting at which such compensation was to be considered and he never agreed to it." Appellant's Br. p. 47-48. Further, Kent's only evidence to support his claim is from his designated expert, who merely stated "I have reviewed sufficient financial information of the Company to determine wages paid to all equity holders of the Company, excluding Mr. K. Smith, have been excessive, such wages greater than reasonable compensation taking the form of a quasi-dividend." Appellant's App. Vol. 5 p. 175.

[37] Without facts about exactly what or how much financial information the expert reviewed, how he came to his conclusion that the compensation was excessive for all equity holders except for Kent, how the compensation compares to similar companies, and what compensation would be reasonable for this

company, we find the expert's affidavit to be a conclusory opinion unsupported by facts. Without facts, the affidavit does not meet the requirements of Indiana Trial Rule 56(E), which provides that an adverse party to a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial." (Emphasis added); *see also Whitlock v. Steel Dynamics, Inc.*, 35 N.E.3d 265, 273 (Ind. Ct. App. 2015) ("[T]he affiants—rather than merely setting forth conclusory statements—were required to give specific details which they perceived to be the basis for their conclusions . . . ."). Further, "a lack of detail in an affidavit goes to the weight and credibility of the affidavit." *Miami Sand & Gravel, LLC v. Nance*, 849 N.E.2d 671, 680 (Ind. Ct. App. 2006) (finding that conclusory statements that lacked specificity and detail in an affidavit were insufficient to create genuine issues of material fact).

[38] We find that Kent did not meet his burden of establishing that a genuine issue of material fact exists as to whether the compensation is unjust, oppressive, or fraudulent. Accordingly, we affirm the trial court's grant of summary judgment.

[39] The judgment of the trial court is affirmed.

Bradford, J., and Altice, J., concur.